was convicted after a bench trial of one count of insurance fraud and one count of home repair fraud. Those charges, he was charged with that resulting from a fire that occurred in February of 2004 at the home of Ava Goss in the 9200 block of South Woodlawn in Chicago, Illinois. Her home caught fire. It was damaged by the fire. And she contracted with a company, Action Fire, to restore the home, to repair the fire damage. Now, Ms. Goss is the victim in one of the two charges that he was found guilty of. Who was the victim in the insurance fraud case? It's stated in the indictment to Allstate Insurance. Anyone from Allstate testify? No, they did not. And what are the elements of insurance fraud? The gist of insurance fraud is that a false claim of damage be made to an insurance company for the purpose of obtaining insurance proceeds. So how did the circuit court find a false claim when no one testified that it was a false claim? Judge, I don't know. Did he explain his ruling? He did not. Did the state in its brief explain how that finding was made? Well, the state in its brief before this court did not explain how the elements of insurance fraud were met. There are four elements? That is correct, Judge. And which of the elements are you disputing? Judge, essentially, well, the four elements are that the defendant knowingly made a claim to an insurance company. And do you dispute that? Yes. The defendant did not. Well, somebody made it. And maybe he was, maybe somebody for the defendant is accountable for made it, made that claim. It is possible, Judge. All right, so let's go on to the second. The second element was that the defendant knew this claim was false. That element is the primary one that we are disputing here today. Essentially, Judge, in the case law that I cited in my brief, indicates this, that a claim of insurance fraud generally requires that a false claim of loss be made. For example, How would, under the facts of this case, what's your best jab at how the claim would have been false? Well, Judge, I don't think that it was false. I think the claim was a legitimate claim. I guess if you're asking me to- Well, let's turn it aside. What's their best argument? Their best argument, I do understand. I don't think that they have an argument, Judge. And I'm, quite honestly, not, I believe that they could have and should have- You'll let them speak for themselves? I will, Judge. How about that, I mean, being the devil's advocate that they got paid for work that they didn't do? That would be the- Judge, assuming that that is the case, and I dispute that, but assuming for the sake of this argument, that may be a crime, but it's not insurance fraud. But there are cases that talk about, it's not insurance fraud, it's home repair fraud that is the equivalent of theft. But not insurance fraud. Correct, and my client was found guilty of home repair fraud as well. But connecting it back to theft, loss of services. Correct. Let's go on to the third one, because the third one is also interesting. The third element? Yeah, the third element. That the defendant knowingly and by deception obtained control, attempted to obtain control or caused control to be obtained over the property of an insurance company. Yeah, the second and third seem to be highly related in that it's a claim, and the second, presumably, is the check itself. Correct. Was there any evidence that your client ever had the check? A check was cut to Ava Boss, the homeowner, and to Action Fight. There was evidence the check was presented during the trial, and Ms. Boss testified that- She didn't sign it. Correct, her name appeared on there, but she didn't sign it. Did Allstate ever say that the wrong person got the check? Well, Allstate never testified. There was no representative from Allstate who ever- So there's no testimony as to who got that check and cash? Well, I think the allegation, although it's a little unclear to me, but I believe the allegation was that Action Fire, somebody at Action Fire forged that signature, although I don't- There was no charge of forgery. The testimony, I can't remember the name of the owner. Well, he was, I believe, Tad Christensen, although he had some people call him Rich, and he had some other- I think the testimony was that somebody, I forget the name of the person, testified that Mr. Christensen's wife said the husband got it signed and negotiated. An employee of Action Fire indicated that he had received the check at the offices of Action Fire, that he had it in his desk. One day it was not there. He inquired and was told that Tad Christensen had cashed it. Now, you set out the elements for the insurance fraud case, but you don't set out the elements for the home repair fraud charge. Judge, I believe that I do. I mean, not numerically or not as- No. Neatly as you do for- Really, I guess you're following the Illinois pattern jury instruction as to insurance fraud. Correct. And I guess the real question I have, is there an instruction regarding home fraud? Yes, Judge. The home- Yes, Your Honor. Okay. You just didn't set it out. I did not, Judge. Your Honor. Regarding the home repair fraud, and I set this out on page 19. A person commits the offense of home repair fraud when he or one for whose conduct he is legally accountable knowingly enters into a contract for home repair and he knowingly promises performance which he does not intend to perform or knows will not be performed. So let me break it down. How many elements are there in home repair?  Three elements. Did you actually look at the Illinois pattern instructions? I do not recall, Judge. The three elements that I would break it down to would be that the defendant entered into a contract, that he knowingly, pursuant to that contract, knowingly promised performance. And the third element being that at the time of the contract signing, he or one for whose conduct he was legally accountable did not intend to perform or knew the work would not be performed. At the time of trial, how much work had been performed? According to the state's attorney in their closing argument, the state's attorney, in her words, indicated that he being the contractor had remodeled almost all of it, it referring to the house. So according to the state's attorney, they concluded, based on their understanding of the evidence, that almost all of the home had been remodeled or repaired. And given that, Judge, Your Honor, I'm sorry. So I was going to say, did you understand the position of the state to be that home repair, in order to avoid a home repair fraud charge, you need to complete 100% of it? Apparently it is, Your Honor. And there is a case, People v. Watts, which I set out. They must be pretty busy under that charge. I would think that they would be because there are very often disputes between homeowners and home repair contractors. Regarding whether or not the job had been finished, whether the quality of the workmanship, along those lines. In our case, Judge, Your Honor, there was a contractor, a person by the name of Dunleavy, who testified. He testified that when he got his contract, a contractor had been hired and then left the job. It was unclear as to why that contractor left the job. Then Dunleavy was hired by Action Fire to come and complete the work. He testified that when he got in there, the home had been gutted. It had been brought down to the framing. There were no walls. There was no drywall. It was down to the framing. He testified that he had installed the installation, the drywall, the flooring consisting of tile, hardware, hardwood, ceramic, and vinyl flooring. He installed cabinets, windows, doors, and a bathroom. He had subcontractors install the plumbing and electrical. It is clear, based on his testimony, that a substantial amount of work had been done. And I think that testimony supported the state's assertion or statement in closing argument that almost all of the home had been remodeled. Yet the judge found him guilty. Nonetheless, did he explain the standard that he was applying? The judge determined that my client, Barry Parks, had been identified in court, and that was another issue, had been identified in court, and he felt that the evidence was sufficient to find him guilty of these two counts. He didn't have a factual basis for this. He did not. He did not give a factual basis for what facts he relied on. This was a case, a bench trial, that was commenced over three or four days spanning several months, and the testimony came in in bits and pieces. Nonetheless, the judge did find that the state had met its burden on both counts, the insurance fraud, even though Allstate did not testify, and even though it was clear that the claim that was filed with Allstate was a legitimate claim. And he also found my client guilty of the home repair fraud, even though there was testimony that a substantial amount of work had been done, and in fact, there was a dispute. The homeowner indicated that she had come out of pocket with $13,000. All right. You'll need to wrap up. I'm sorry. Is there any evidence in this record whatsoever that your client actually made a promise to the homeowner to repair her home? No. The one contract that was signed, and I mark it as A-10 in my appendix, was signed by Ava Goss and Terry O'Keefe, a representative of Action Fire. Every time Ms. Goss saw your client, she saw them in the company of Mr. O'Keefe. Correct. So to the extent that she saw them as one individual or one entity. Well, Ms. Chapman saw one as the boss and one as the employee. But the issue is what, if anything, did my client do that rendered him accountable? What actions did he take, or how did he aid and assist O'Keefe in committing what, if it was a crime, what actions did he take? Additionally, Judge, there is an issue of identification. We know. We know. But let's not spend any time on that. In fact, why don't you wrap up and we'll give you some time for rebuttal. Judge, we would ask that on behalf of Barry Parks that you find that the evidence was insufficient to find him guilty of home repair fraud and insurance fraud. Thank you. Nice to see you, counsel. Good to see you. I haven't seen you in about 20 years. It's been a while. Nice to see you up there. It's nice to see you, too. May it please the Court. I'm Assistant State's Attorney Stacia Weber representing the people of the state of Illinois. It is not clear that defendants or his company made the repairs that they promised, and he did make a promise. What of the admission or what are we to make of the statement during closing arguments that substantially all the work had been done? Statements, first, Your Honors, statements made during closing arguments are not evidence. Right. They're not evidence. But do you think that they would reflect the evidence that was presented at court, and you would think that the statement by the Assistant State's Attorney at a trial would only make that statement if it was consistent with the evidence? Or if you're taking the position that it isn't consistent with the evidence, you've got to tell us what evidence is inconsistent with that statement. Well, here's the evidence that was inconsistent. In March, Ms. Goss signed a contract with Action. No work was completed until two months later. Then they sent two men out for one day to work on the roof. They were doing an unsatisfactory job. They took them back. Then no work was done until October when John Dunleavy and his company came, and they worked for two weeks, and they quit because they weren't getting paid. Let me ask you this. At the time of trial, does the judge only look at those dates, or does he look at what occurred at the time or what the condition of the home was at the time the trial occurred? At least at the time of the charges. At the time of the charges. He may look at the state of the home at the time the charges were filed, but Ms. Goss was the one who was paying for those repairs. She paid $13,000, not Defendant's company, not Defendant. Defendant owed John Dunleavy $6,400. That is the extent of the money that they put in to repairing her home, and they didn't even pay them at the time. They paid after they had quit for not getting paid, and I'm assuming a dispute broke out. But $6,400, that is what Defendant's company put into this home. The check that they received from Allstate was $45,000. It's clear that they never had any intention of fixing her home. So your argument right now is to the home repair fraud or to the insurance fraud? Right now I'm arguing the home repair fraud, that they did not complete the repairs, and that they had the money to do it. They had the money to complete the repairs, but they weren't doing them. After they received the money and before they sent to John Dunleavy, the contractor, they offered her $2,000 to settle, to go away. $2,000. That's clear that they never had this intent. They never had the intent to fix the home. But they did fix the home. To some extent, they just didn't complete the work. They did minimal work. They did minimal work. After John Dunleavy quit, the electrical work was unattached. The sidewalk and the porch were destroyed. Her bathroom wasn't finished. They left doors uninstalled, kitchen fixtures uninstalled, and they generally left a mess. Let me ask you this. Regarding Ms. Claus' testimony, did she testify that the $13,000 that she paid to the other contractor covered the work that she expected to have been covered? And I'm asking this as an explicit question to her. Did she expect the work that she paid for to have been covered by the amount of money she received from Allstate? I don't think that there is a doubt to that in the testimony. Well, didn't she say that? When she asked that question, did she answer that question? She was not asked the question, but her home was still in disrepair. Do you think that's part of your burden of proof? No, I think that they promised to fix her home. They promised to repair it to its original state, and it's clear that that never happened. Let me ask you this. That's what he's asking about. She could have put up a gold trim around the borders of the room. What if she enhanced what she had there previously, and therefore paid additional money, $13,000, in addition to what would have restored her home? She paid extra money because she wanted extra things. I think that that's just not what the record shows. How important is it to make sure the record is clear? We showed that Allstate believed that her repairs would cost $45,000. They spent $6,400. She spent $13,000. That's not enough to get a home that was completely destroyed by fire back to its original condition. It just isn't. And I think the way that the defendant and his company dragged this on for a period of nine months shows that they just never had any intention of actually repairing her home. Ms. Weber, can I take a step back, and I apologize for doing this to my brother and my sister, but would you detail for me quickly the elements of home repair fraud? Absolutely. It occurs when someone knowingly enters into a contract for home repair, written or oral. It can be an oral contract. And they promise performance which they do not intend to perform or they know will not be performed. And the state met the burden on both of these charges. The defendant came to her house. He met with her the day after her fire. Ms. Goss' testimony referred to them both as one, that maybe the other guy was defendant's boss, but she testified that they both promised her that the work would be done. They both promised that they would interact on her behalf at all states. And at some point, Mr. O'Keefe left the company and defendant became her primary contact. It was defendant that she was calling. It was defendant who kept promising her that the home would be repaired. As to the insurance fraud claim, it's true that Illinois case law has not interpreted the insurance fraud statute to apply in a situation such as this. Ms. Goss did have a legitimate claim for home repair. Her house burned down by fire. The false claim comes from action. They represented to all states that it would be them, not Ms. Goss, who was incurring the loss for repairing after the fire, that they would incur loss for materials, they would incur loss for labor, they would incur loss for overhead, and that they should get the insurance check because they would be paying for the repairs. But that's not what happened. In effect, this is action vis-a-vis all states, correct? Action vis-a-vis all states, yes. And how do you tie the very parts to action vis-a-vis all states, if you'd be so kind? Sure. The defendant was an employee. And it's uncontested from the record that he was a public adjuster and a salesman from action and that this was his job. His job was to interact with the insurance company on behalf of his client. Weren't there two different contracts with all states? I thought I read that there were two different contracts with all states, one that involves the adjuster and one that involves the company separately. Not that I am aware of. Are there any cases involving home repair fraud where an employee of the company that engages in disreputable conduct is charged criminally for the conduct of the company itself? Not that I am aware of. Not that I can find. What if the defendant, this defendant, the employee, had every intention of complying with the contract that was signed with this cause, but the owner, the person in control said or had intent, clear intent, unquestioned intent, not to do anything of the kind? Whose intent would control the outcome in a criminal charge? I think his behavior shows his intent. The other two, a public insurer and salesman that testified for the people. You mean if he didn't go there and help repair the work? No, he could have walked away. He could have contacted the attorney's job. He could have put his job up and tried to find another job? That is what Lise Sela and Corey Meister who testified for the people as former public adjusters and salesmen for Action, that is what they did. They contacted the AG. They contacted their clients. They told their clients, basically Action is ripping you off. You need to terminate your contract with them. You need to contact the AG's office. They walked away. The defendant never walked away. He stayed for the entirety of this whole process from the very first day. Parks' only option to have avoided criminal liability would have been to have resigned and traipsed over to Lisa Madigan's office? That would have showed that he wasn't liable. I'm not saying that that is his only option, but he didn't do any of that. I think his intent did show that he was liable. He had an obligation. Because he didn't, he incurred, in your estimation, criminal liability. I think he incurred criminal liability from the get-go. And the individuals that were complaining to the Attorney General's office, the individuals that said Action Fire should not be a company you should contract with, were they complaining about Mr. Parks? They were complaining about the company. They were complaining about the company. Who owns the company? Mr. Christensen and his wife. Yes. Were they charged in this case? They were charged in a different case. They were both convicted. But they weren't charged in Ms. Goss' case. I'm not sure who the complaining witnesses were in that case. I don't have the record for that. But in this case, it's clear from the circumstantial evidence. Let me state it differently. They weren't co-defendants with Mr. Parks. They were not. They were not. The sufficiency of the evidence must be viewed in the light most favorable to the people. And here it's not so improbable or impossible as to raise a reasonable doubt for defendant's guilt. Let me just ask you those two, regarding the two elements of insurance fraud. How was the claim false? What evidence was the claim was false? The claim was false, Ed, because Action represented to all states that they would be incurring loss for fixing Ms. Goss' home, and they didn't do that.  So the claim is false from the perspective of Action Fire, and not from the perspective of the all-state insurance? I don't think that that interpretation of the statute is at odds with plain reading. Should we ascribe any importance to the fact that nobody showed up from all states? Certainly it would have been better for all states to testify. But the evidence here was enough to show they had the checks. Ryan Fisher testified that these checks were all-state. Why would you have convicted Barry Parks of insurance fraud in the absence of any testimony from all-state insurance? Because there was evidence that the check from all-state intended to fix Ms. Goss' home was cashed in their bank account. And the connection between Barry Parks and the check? Is that he was an employee, and that he was her public adjuster. It was his responsibility to ensure that her home was repaired. And as the public adjuster, it's his responsibility to make sure that every claim that she has against her insurance company or for reimbursement by her insurance company is properly recognized and duly accounted for by her insurance company. And so that the money that the insurance company pays is adequate to make her whole. But in terms of actually doing the work that needs to get done to physically make her whole, I don't see how the public adjuster has any role in that. In this case, he does, because he was an employee of action, and he recommended that they be in charge of completing her home repairs. He vouched for this company. Let me ask you this. You make much of the fact that because he was an employee of action, dot, dot, dot, was it his special role as the public adjuster that tripped him up, as it were, and resulted in the criminal liability that you contend that flowed his direction? What if he had been a file clerk? If he was a file clerk that approached the victim and convinced her to sign the contract with action, then certainly a file clerk would be responsible. There's a difference between a salesman selling a reputable product and a stakeholder salesman who knows that he's selling a promise that's worthless. So for these reasons and those stated in our brief, we ask that this court affirm defendant's convictions for insurance fraud and home repair fraud. Are you aware whether there is a IPI instruction on home repair fraud? No, Your Honor. I'm not aware. Thank you. A brief, very brief rebuttal. Thank you, Your Honor. First of all, regarding defendant's status as a public adjuster, he may have been a public adjuster, but he was not acting as the public adjuster on behalf of Ava Goss on this case. Ava Goss simply signed a contract with Action Fire to do the repairs. There is no evidence in the record that defendant Barry Parks represented himself to be a public adjuster to Ms. Goss or asked that he be allowed to represent her as a public adjuster. Would you concede that a false claim would have been made by a public adjuster by Mr. Parks had he submitted a claim to Allstate Insurance representing that $45,000 of fire damage was incurred, but really only $30,000 of fire damage was incurred? If he inflated a claim, yes, I would agree with that. And to demonstrate that, you would presumably need Allstate Insurance? We would need Allstate Insurance, yes. But, again, he was not acting in his role as a public adjuster on behalf of Ava Goss in this situation. At best, he was merely a salesman for Action Fire. Now, does his characterization of public adjuster have any relevance to the home repair fraud? I mean, can he both be a public adjuster regarding an insurance claim and then some sort of different position that he holds regarding home repair fraud? I mean, if he was a public adjuster for an insurance claim, I can understand that. How does he incur liability, criminal responsibility under home repair fraud? He does not because it requires at the time of the signing of the contract for the repair, for the repair, that he have an intent to not perform the work or that he knows that the work will not be performed. And dealing with the issue of intent, which Your Honor discussed, it's unclear to me as to whose intent the State was alleging we are dealing with here. The State acknowledged in closing argument that they were proceeding under a theory of accountability. They also acknowledged that the defendant was accountable, or they did not acknowledge, they stated, they asserted, they claimed that the defendant was accountable for the conduct of Tad Christensen. But there was no evidence whatsoever as to what Christensen's intent was at the time that this contract was signed. Which is the gist of the home repair fraud statute? What is the intent at the time of the contract signing? And it's clear to me, and I dispute the State's characterization of the facts. Initially, affordable construction, I believe, was hired by Action Fire to do the repair. There was a dispute. They walked off the job. That's when Dunleavy came in. That's when Dunleavy came in and he did the work that I spoke of earlier. And in the words of the State, remodeled almost all of it, it being the house. I also dispute the assertion that after O'Keefe left, and it's not clear to me in the record as to when or if he even left, and keep in mind he was never charged, that the State asserted that she, Ava Boss, then had contact with Perry Parks. I saw no record, no evidence of that in the record, that she had any contact with Perry Parks, other than him apparently merely being present on one or two or three occasions with O'Keefe. Correct. All right, give me the record. We would ask, just simply reiterate, and ask that you reverse the trial court and its findings and find my client not guilty. All right, thank you very much. We'll take the case under advisement. I believe, just as I